## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

GATEHOUSE WATER LLC, §
*Plaintiff* §
§
v. §
§
LOST PINES GROUNDWATER §
CONSERVATION DISTRICT, §         No. 1:22-CV-00132-LY
MICHAEL TALBOT, SHERIL §
SMITH, MICHAEL SIMMANG, §
DAVID FLEMING, HERBERT §
COOK, LARRY SCHATTE, KAY §
ROGERS, PHIL COOK, BILLY §
SHERRILL, CARL STEINBACH, §
MELISSA COLE, THOMAS §
ARSUFFI, ELVIS HERNANDEZ, §
*Defendants* §

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE LEE YEAKEL
      UNITED STATES DISTRICT JUDGE

Before the Court is Plaintiff GateHouse Water LLC's Motion for Partial
Summary Judgment, Dkt. 58, and all related briefing. After reviewing these filings
and the relevant case law, the undersigned issues the following report and
recommendation.

## I.      BACKGROUND

Plaintiff GateHouse Water, LLC ("GateHouse") initiated this lawsuit against
Defendants Lost Pines Groundwater Conservation District ("Lost Pines" or "the
District"), Michael Talbot, Billy Sherrill, Carl Steinbach, Michael Simmang, Sheril
Smith, David Fleming, Herbert Cook, Larry Schatte, Kay Rogers, Phil Cook, Melissa

1

Cole,[1] Thomas Arsuffi, and Elvis Hernandez (the "Individual Defendants," and together with the District, "Defendants").[2] GateHouse is a Texas limited liability company that acquired municipal wells, groundwater leases, and operation permits from its predecessor-in-interest Forestar Real Estate Group, Inc. ("Forestar"). Dkt. 64, at 18-19, 28. At issue in the motion before the undersigned are operating permits granting GateHouse the right to produce groundwater from more than 10,000 acres in Lee County, Texas. Dkt. 58, at 1.

Each of the operating permits includes a special condition ("Special Condition 8") that requires GateHouse to "have a binding contract or contracts to provide at least 12,000 acre-feet of water per year to one or more End Users in one or more authorized places of use" by the fifth anniversary date of the issuance of the permit. Dkts. 64-9, at 16; 30-1, at 18; 58, at 2. For some of the permits the five-year anniversary was January 21, 2021, and for others, the anniversary was January 26, 2021. Dkts. 64, at 28; 64-9; 30-1.

GateHouse states that it satisfied Special Condition 8 when it sent a copy of an agreement with the Central Texas Water Supply Corporation ("CTWSC") titled "2021 Water Supply Contract for 12,000 acre-feet with Option for Forty-Year Renewal" to Lost Pines. Dkts. 58, at 4; 64-17. GateHouse claims that the "CTWSC Contract provided for the sale of the entirety of its current allowed production phase,

---

[1] Gatehouse brings claims against Defendants Michael Talbot, Billy Sherrill, Carl Steinbach, Michael Simmang, Sheril Smith, David Fleming, Herbert Cook, Larry Schatte, Kay Rogers, Phil Cook, and Melissa Cole in their official and individual capacities as directors of the Lost Pines Groundwater Conservation District. Dkt. 64, at 1-2.
[2] Gatehouse brings claims against Thomas Arsuffi and Elvis Hernandez in their official capacities as directors of the Lost Pines Groundwater Conservation District. Dkt. 64, at 2.

i.e., 12,000 acre-feet during the calendar year 2021." Dkt. 58, at 4. After GateHouse submitted the agreement, Lost Pines suspended Special Condition 8 while it evaluated the validity of the CTWSC contract. Dkts. 58, at 4; 64-18. The District ultimately found that the contract did not comply with Special Condition 8, effectively halting GateHouse's ability to produce and transport groundwater under its permits because the District reduced GateHouse's permitted groundwater production authorization from 28,500 acre-feet of groundwater per year to zero acre-feet of groundwater per year. Dkts. 58, at 10; 64, at 32-35, 40-41; 64-1; 64-2; 64-3; 64-20; 64-22. GateHouse states that the District's finding as to the CTWSC contract and Special Condition 8, and its reduction of GateHouse's groundwater production allowance, "deprived GateHouse of its ability to exercise the constitutionally protected property rights under its GateHouse leases …." Dkt. 58, at 10.

GateHouse originally brought eight causes of action based on what it considered to be the Defendants' unlawful and *ultra vires* actions regarding its permits, which GateHouse alleges violated its state and federal rights. Dkts. 29, at 43-94; 64, at 45-98. Defendants then moved to dismiss GateHouse's claims. Dkt. 30. The District Court adopted the undersigned's Report and Recommendation on that motion and dismissed with prejudice GateHouse's equal protection claims against the individual Defendants in their official capacities, the procedural due process claims against all Defendants, and the substantive due process claims against all Defendants. Dkt. 61, at 1-2. The District Court also dismissed without prejudice GateHouse's *ultra vires* claims against the Individual Defendants. *Id.* at 2.

3

GateHouse now moves for partial summary judgment as a matter of law on its *ultra vires* claims against the Individual Defendants in their official capacities as members of the governing body of Lost Pines. Dkt. 58, at 1, 18. GateHouse argues that the individual Defendant Directors and Defendant District violated the separation of powers clause in Article II of the Texas Constitution when they adjudicated the validity of the CTWSC contract. *Id*. at 18.[3] On that basis, GateHouse asks the Court to set aside the District's ruling that the contract did not meet Special Condition 8 and the District's orders concerning the reduction of GateHouse's authorized production. *Id*. In response Lost Pines argues that when it made decisions concerning whether the contract complied with Special Condition 8, it was acting within its express and implied powers to "interpret and enforce a permit under its purview and a contract to which [it] was a party." Dkt. 62, at 4. The District argues that GateHouse has not accounted for its express and implied powers, nor addressed the "contours of [its] authority" as required for an *ultra vires* claim. *Id*. at 9.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return

a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.     DISCUSSION

### A.     Relevant Factual Background

     1.     Lost Pines's Duties and Authority

Lost Pines is one of 89 districts created by the Texas Legislature for the preservation, conservation, and development of various natural resources. Tex. Spec. Dist. Code § 8849.02; Tex. Const. Art. XVI, § 59. The Texas Constitution provides that the "Legislature shall pass all such laws as may be appropriate" including for the creation of "conservation and reclamation districts" that are "governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law." Tex. Const. Art. XVI, § 59(a)-(b). Chapter 36 of the Texas Water Code governs districts created under Art. XVI, § 59 of the Texas Constitution which have "the authority to regulate the spacing of water wells, the production from water wells, or both." Tex. Water Code § 36.001(2). Chapter 36 further provides:

> In order to provide for the conservation, preservation, protection, recharging, and prevention of waste of groundwater, and of groundwater reservoirs or their subdivisions, and to control subsidence caused by withdrawal of water from those groundwater reservoirs or their subdivisions, consistent with the objectives of Section 59, Article XVI, Texas Constitution, groundwater conservation districts may be created as provided by this chapter. Groundwater conservation districts created as provided by this chapter are the state's preferred method of groundwater management in order to protect property rights, balance the conservation and development of groundwater to meet the needs of this state, and use the best available science in the conservation and development of groundwater through rules developed, adopted, and promulgated by a district in accordance with the provisions of this chapter.

6

*Id.* § 36.0005

Lost Pines, like many water districts, is governed by a board of ten directors tasked with "management of all of the affairs of the district." Tex. Spec. Dist. Code § 8849.0051; Tex. Water Code § 36.057. In fulfilling this responsibility, Lost Pines can "employ or contract with persons, firms, partnerships, corporations, or other entities … deemed necessary by the board for the conduct of the affairs of the district." Tex. Water Code § 36.057. One of the primary responsibilities of Lost Pines and its board is to "develop or contract to develop a district management plan under" § 36.1071 of the Water Code." Tex. Spec. Dist. Code § 8849.105. The management plan is required to address the following management goals:

    (1) providing the most efficient use of groundwater;

    (2) controlling and preventing waste of groundwater;

    (3) controlling and preventing subsidence;

    (4) addressing conjunctive surface water management issues;

    (5) addressing natural resource issues;

    (6) addressing drought conditions;

    (7) addressing conservation, recharge enhancement, rainwater harvesting, precipitation enhancement, or brush control, where appropriate and cost-effective.

Tex. Water Code. § 36.1071(a)(1)-(7).

In developing the management plan, Lost Pines has wide latitude to determine the "performance standards and management objectives" and is allowed to "adopt the rules necessary to implement the management plan." *Id.* § 36.1071(e)(1). Pursuant to the management plan, Lost Pines can "make and enforce rules, including

limiting groundwater production … to provide for conserving, preserving, protecting, and recharging of the groundwater or of a groundwater reservoir or it's its subdivisions in order to control subsidence, prevent degradation of water quality, or prevent waste of groundwater…." *Id.* § 36.101(a). Lost Pines may also "purchase, sell, transport, and distribute surface water or groundwater." *Id.* § 36.104.

In addition to the District's powers and duties to develop a management plan, make and enforce rules related to groundwater production, and buy and sell surface and groundwater, Lost Pines also has a duty to require permits for the "drilling, equipping, operating, or completing of wells or well pumps." *Id.* § 36.113(a). A permit issued by the District must include "the terms and provisions prescribed by the district" and may include: the name of the permittee, the location of the well, the date the permit is set to expire if no well is drilled, "the conditions and restrictions, if any, placed on the rate and amount of withdrawal." *Id.* § 36.1131(a)-(b)(1)-(11). In issuing permits, the District is tasked with managing the "total groundwater production on a long-term basis." *Id.* § 36.1132(a).

Permit applicants may administratively appeal a decision of the board on a permit by requesting written findings and conclusions. *Id.* § 36.412. After the applicant receives the written findings and conclusions, it may request a rehearing of his permit. *Id.* § 36.412(b). The board has discretion as to whether or not to grant a request for a rehearing. *Id.* § 36.412(d)-(e). A decision by the board on a permit is final if the request for rehearing is untimely or timely but denied or if the board renders a written decision after rehearing. *Id.* § 36.413.

A person affected by and dissatisfied with "any rule or order made by a district," "including an appeal of a decision on a permit application, is entitled to file a suit against the district or its directors to challenge the validity of the law, rule, or order." *Id.* § 36.251. "The suit shall be filed in a court of competent jurisdiction in any county in which the district or any part of the district is located. The suit may only be filed after all administrative appeals to the district are final." *Id.* However, for liability purposes, "a director is immune from suit and immune from liability for official votes and official actions." Tex. Spec. Dist. Code § 8849.055. "To the extent an official vote or official action conforms to laws relating to conflicts of interest, abuse of office, or constitutional obligations, [the Water Code] provides immunity for those actions." Tex. Water Code § 36.066.

2.      Lost Pines's review of GateHouse's well operation permits

GateHouse's well operation permits were originally issued to Gatehouse's predecessor-in-interest, Forestar, as part of a settlement agreement between Lost Pines and Forestar. Dkt. 30-1, at 3. As part of the agreement Lost Pines and Forestar acknowledged that the operating permits are "'living' documents and will be subject to review periodically, and possibly more often than the 5-year renewal process, based upon additional data and science obtained by the District from the Monitoring Well System." *Id.* at 6. The permits each contain several special conditions in addition to the standard permit provisions. One of those special conditions, Special Condition 8, provides:

> (8) Beginning no later than the fifth (5th) anniversary of the date of issuance of the Permit, Permittee shall have a binding contract or

contracts to provide at least 12,000 acre-feet of water per year to one or more End Users in one or more authorized places of use. If Permittee does not have such a contract or contracts, then the aggregated annual withdrawal amount in this Permit shall be automatically reduced to the amount for which Permittee has a binding contract or contracts, and the General Manager is authorized to issue an amendment to this Permit reflecting the reduced amount.

*Id.* at 18.

The five-year anniversary for some of the permits was January 21, 2021, and for others, the anniversary was January 26, 2021. Dkts. 64, at 28; 64-9; 30-1. On January 20, 2021, GateHouse presented Lost Pines with a copy of its agreement with CTWSC titled "2021 Water Supply Contract for 12,000 acre-feet with Option for Forty-Year Renewal." Dkt. 64-17; 58, at 4. GateHouse argues that its agreement with CTWSC satisfied Special Condition 8. Dkt. 58, at 4. At the January 20, 2021, meeting of the Lost Pines board, the directors voted to suspend Special Condition 8 so that GateHouse's operating permits would not be altered "until the validity of the submitted contract is evaluated." Dkt. 64-18. At the July 21, 2021, meeting of the board, the board determined by vote that the GateHouse contract with CTWSC did not comply with Special Condition 8. Dkt. 64-20, at 3. At the July 27, 2021, meeting GateHouse's submission was reconsidered but was ultimately found to not comply with Special Condition 8. *Id.* By order, the Board lifted the suspension of Special Condition 8, found that the CTWSC contract did not comply with Special Condition 8, and directed the general manager of the District to amend the operating permits so that the aggregated annual withdrawal limit was reduced to zero. Dkt. 64-1, at 3.

GateHouse filed a request seeking the Board's Findings of Facts and Conclusions of Law regarding the order and findings with respect to the CTWSC

contract's compliance with Special Condition 8. Dkts. 58, at 6; 64-5. The Board subsequently adopted and published its findings. Dkt. 64-6. The Board found that the agreement stipulates only that "Central Texas [CTWSC] 'agrees to purchase and does hereby purchase from [GateHouse] 12,000 acre-feet of groundwater during the Contract Term for $1.00, whether Buyer can actually take delivery of the water.'" Dkt. 64-6, at 4. The Board also found that, the under the terms of the agreement, CTWSC "has no obligation to accept delivery of or to collect the water subject to the agreement" and "title of the groundwater remains with GateHouse unless and until delivered to Central Texas." *Id.* The agreement also had an expiration date and only one binding clause, obligating Central Texas to pay $1.00 for the option to acquire the water. *Id.* Under the terms of the agreement, this obligation was not triggered unless "water was actually delivered by Seller to Buyer … during the term of [the] Agreement." *Id.* Though GateHouse and CTWSC represented to the District that CTWSC paid the $1.00 consideration, the District found that neither Gatehouse nor CTWSC had not represented that any water had been delivered to or accepted by CTWSC, nor that title to the water had transferred to at the time the agreement was submitted to the Board. *Id.*

Based on these findings the Board made several conclusions of law about the agreement and whether it complied with Special Condition 8:

12. The Central Texas Agreement is no more than a non-binding option contract.

13. The Central Texas Agreement is illusory.

14. The Central Texas Agreement is not supported by adequate consideration.

15. The purported Option described in the Second Paragraph 1.0 of the Central Texas Agreement is not a valid option but is, instead, an unenforceable agreement to agree.

16. GateHouse has failed to provide any binding contracts sufficient to justify compliance with Special Condition No. 8 of the Operating Permits for the Permitted Wells issued by the District.

*Id.* at 7.

GateHouse's motion for partial summary judgment argues that these findings amount to an improper, extra-judicial adjudication of its contract with CTWSC, were *ultra vires,* and unconstitutional. Dkt. 58, at 9-10. Lost Pines responds that the actions it took in relation to the CTWSC agreement were taken pursuant to the District's power to interpret and enforce "a permit under the District's purview and a contract to which the District is a party." Dkt. 62, at 4. These acts, the District argues, were not *ultra vires* and did not violate the separation of powers principles of the Texas Constitution. *Id.* at 7.

## B.   **Gatehouse's *Ultra Vires* Claim**

"Under Texas law, a suit against a government employee in his official capacity is a suit against his government employer with one exception: an action alleging that the employee acted *ultra vires.*" *Franka v. Velasquez,* 332 S.W.3d 367, 382 (Tex. 2011). An *ultra vires* action is one in which a plaintiff seeks "relief in an official-capacity suit against a government actor who allegedly has violated statutory or constitutional provisions by acting without legal authority or by failing to perform a purely ministerial act." *Lazarides v. Farris,* 367 S.W.3d 788, 795 (Tex. App.— Houston [14th Dist.] 2012, no pet.) (citing *City of El Paso v. Heinrich,* 284 S.W.3d 366, 372-73 (Tex. 2009)). "An *ultra vires* claim based on actions taken 'without legal

authority' has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority." *Hall v. McRaven,* 508 S.W.3d 232, 239 (Tex. 2017). The only remedies available under Texas law for an *ultra vires* claim are prospective declaratory and injunctive relief. *Heinrich,* 284 S.W.3d at 372-73.

In its motion for partial summary judgment, GateHouse asks the Court to find that the District lacked authority to adjudicate the CTWSC contract and did adjudicate the contract when it declared that the agreement was no more than a binding option contract, was illusory, and not supported by adequate consideration, and thus, did not comply with Special Condition 8. Dkts. 58, at 18; 64-6, at 7. Further, GateHouse asks the Court to set aside the District's vote as to compliance with Special Condition 8, and its order adopting findings of fact and conclusions of law, as well as its order reducing GateHouse's authorized production under its operating contracts from 28,500 acre-feet per year to zero acre-feet per year. Dkt. 58, at 18. GateHouse also asks the Court to set this matter for trial on the amount of damages caused by the District's alleged unlawful actions. *Id.*

GateHouse's motion states that the sole question before the Court is "whether the District and its Directors have the authority to adjudicate the validity of a contract." Dkt. 58, at 11. The District responds that GateHouse asks the wrong question. Dkt. 62, at 5. Rather, the issue before the Court in the District's view is whether the District had the authority to "determine[] that a permittee failed to comply with a permit requirement, which arose out of a contract, in a groundwater

permit under their purview." *Id.* at 6. *Ultra vires* claims depend on the scope of a state official's authority. *Hall,* 508 S.W.3d at 234. Indeed, to prevail on its *ultra vires* claim, GateHouse must "plead and prove that" that Lost Pines "acted without legal authority." *Chambers-Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 344-45 (Tex. 2019). As such, the undersigned will primarily assess whether GateHouse has adequately addressed the scope of Lost Pines's authority and proved that Lost Pines acted outside of its authority.

GateHouse's motion characterizes Lost Pines's conduct as entirely centered on determining the validity of the CTWSC contract and concludes that Lost Pines's actions were adjudicative in nature. Dkt. 58, at 4. GateHouse argues that Article II of the Texas Constitution contemplates three separate departments of state government and that among these three departments "no person, or collection of persons being one of these departments, shall exercise any power properly attached to either of the others." *Id.* at 5 (citing Tex. Const. Art. II, § 8). GateHouse then states that the District is a member of the executive department pursuant to its enabling act. *Id.* It then points to Lost Pines's findings of fact and conclusions of law (which GateHouse itself requested) and concludes that the District's actions amounted to adjudication of a contract, a "determination reserved to the judicial department of Texas state government" and "not a power conferred upon [the District] by the Texas Legislature." *Id.* at 13.

GateHouse also argues that the District's actions in adjudicating the CTWSC agreement had the effect of reducing GateHouse's authorized volume of production

under the operating permits, and ultimately resulted in the loss of GateHouse's constitutionally protected rights to groundwater. *Id.* at 12. GateHouse argues that water districts such as Lost Pines "only have the power to 'administer the conservation laws,' not to adjudicate rights or other matters reserved to the judicial Department which "questions must be settled in the Courts." *Id.* at 14 (citing *Magnolia Petroleoum Co. v. R.R. Comm'n of Tex.*,170 S.W.2d 189, 191 (Tex. 1943)). The District's actions, GateHouse contends, "violated the Separation of Powers Clause of the Texas Constitution and exceeded the limited authority granted to the Defendant District and Defendant Directors by the Texas Legislature through Chapter 36, Texas Water Code, and the District's enabling Legislation codified in Chapter 8849, Texas Special District Local Laws Code." Dkt. 58, at 16 (citing Tex. Const. art. II, § 1; Tex. Water Code Ch. 36; Tex. Spec. Dist. Code Ch. 8849).

In response, Lost Pines agrees that it was created by the Texas Legislature, operates under the authority of the Texas Water Code, and does not have the authority to act as the judiciary. Dkt. 62, at 5, 17. However, the District argues that the express and implied powers of the District conferred by the Legislature allow it to make determinations concerning permits under its purview and contracts to which it is a party. *Id.* at 4. The District characterizes its conduct as determining that GateHouse failed to comply with a permit requirement in a permit issued by the District, that arose out of the settlement agreement with GateHouse's predecessor-in-interest. *Id.* at 6. The District cites its express authority to issue and enforce permits with expiration dates, conditions on the rate and amount of groundwater

withdrawal, and any other terms and conditions reasonably related to "conservation, preservation, protection, recharging, and prevention of waste of groundwater." Dkt. 62, at 7 (citing Tex. Water Code §§ 36.113(c)(8)(B), 36.1131). The District also states that it has the express power to sue and be sued and an accompanying implied power to enter into settlement agreements. Dkt. 62, at 7-8.

The District argues that pursuant to these powers it had the authority to review the CTWSC agreement for compliance with Special Condition 8, both as the issuer of the permit requiring compliance with Special Condition 8, and as a party to the settlement agreement that required Special Condition 8 to be added to the permits at issue. Dkt. 62, at 10. The District states that it found "GateHouse was in violation of a contract provision, a mandatory permit requirement, or some combination of the two." *Id.* at 12. The District goes on to argue that even if it was wrong in its determination that the CTWSC contract was non-binding and did not comply with Special Condition 8, that was an erroneous decision made within its authority to make a decision is not an *ultra vires* action. *Id.* at 13. Further, the District argues that, because it was allowed to include Special Condition 8 in the permit as part of the Settlement Agreement, it was within its authority to determine whether a contract submitted in consideration of Special Condition 8 complied with the condition. *Id.* at 13. The District argues that GateHouse has failed to meet its burden to show that the District acted without authority. *Id.* As a result, GateHouse's motion should be denied. *Id.*

As to Lost Pines's argument concerning its authority to make a determination about the CTSWC agreement as a party to the Forestar Settlement Agreement, GateHouse responds that the Settlement Agreement is moot for the purposes of its motion. Dkt. 63, at 3. GateHouse argues that the Settlement Agreement required only that Special Condition 8 be included in the operating permits but does not necessarily govern compliance with Special Condition 8 such that Special Condition 8 is a "term from the settlement agreement that [the District] might have some ability to enforce." *Id.* at 6. The undersigned will set aside the parties' arguments about whether Special Condition 8 can be viewed as a term of the Settlement Agreement that can be enforced by the District. The more straightforward question at this juncture is whether the District had the authority to include and enforce Special Condition 8 of the operating permits. The undersigned finds that GateHouse has not met its burden of proving that the District did not have authority to include Special Condition 8 or to enforce the condition.

Typically, an analysis of an *ultra vires* claim begins with an examination of the enabling act that sets the parameters of an official's discretion.[4] *Houston Belt &*

---

[4] In *Houston Belt & Terminal Ry. Co. v. City of Houston*, for example, the plaintiff complained that the Director of Public Works and Engineering acted *ultra vires* when he imposed a drainage fee based on an unlawful determination of the permeability of the plaintiff's property. 487 S.W.3d 154, 158 (Tex. 2016). The court looked first to the ordinance at issue, which the court described as the Director's "enabling law." *Id.* at 158, 165. The ordinance stated that the Director should make permeability determinations "on the basis of digital-map data … or other similar reliable data as shall be determined by the director." Instead of digital map data, the Director relied on aerial photographs. *Id.* at 159. The Texas Supreme Court found that the ordinance gave some discretion to the Director in his permeability determinations, but his discretion was not absolute. *Id.* at 168. The Director's misinterpretation of his own limits in making a permeability determination was a valid basis for an *ultra vires* claim because his misinterpretation of the limits of the ordinance amounted to a misinterpretation of the bounds of his own authority. *Id.* at 162-65.

*Terminal Ry. Co. v. City of Houston,* 487 S.W.3d 154, 158 (Tex. 2016); *Henry v. Sullivan*, No. 21-0032, 2022 WL 5287784, at *2 (Tex. Oct. 7, 2022) (turning first to the Texas Constitution and Texas Local Government Code in determining whether county commissioner's court had the authority and discretion to decide whether to pay County Judge a supplemental salary where the judge brought an *ultra vires* claim against the commissioner's court.) Here, Chapter 36 of the Texas Local Government Code grants Lost Pines "broad authority to manage, conserve, and protect groundwater resources through rulemaking and permitting." *Guitar Holding Co. v. Hudspeth Cty. Underground Water Conservation Dist. No. 1*, 263 S.W.3d 910, 912 (Tex. 2008) (citing Tex. Water Code §§ 36.101(a), 36.113(a)).

Lost Pines has a duty to require permits for the "drilling, equipping, operating, or completing of wells or well pumps." Tex. Water Code § 36.113. These permits must include "the terms and provisions prescribed by the district" which may include terms and conditions reasonably related to "conservation, preservation, protection, recharging, and prevention of waste of groundwater." Tex. Water Code §§ 36.113(c)(8)(B); 36.1131; 36.101(a)(4). In issuing permits, the District is tasked with managing the "total groundwater production on a long-term basis." *Id.* § 36.1132(a). To that end, the District also has the authority to include "conditions and restrictions … on the rate and amount of withdrawal" of groundwater. *Id.* § 36.1131(b)(8).

Although GateHouse's second amended complaint raises the argument that the District and its Directors "lacked authority to impose [Special Condition 8]" in the

first instance, GateHouse has not proven that Special Condition 8 is not reasonably related to conservation, preservation, protection, recharging and prevention of waste of groundwater or that it does not qualify as a condition or restriction on the rate and amount of withdrawal. Dkt. 64, at 65. The record shows that Special Condition 8 provides that if the permittee does not have a contract to provide at least 12,000 acre-feet of water per year to one or more end users, "then the aggregated annual withdrawal amount in this Permit shall be automatically reduced to the amount for which Permittee has a binding contract or contracts, and the General Manager is authorized to issue an amendment to this Permit reflecting the reduced amount." Dkt. 64-6, at 3. Special Condition 8 falls into the category of "a condition and restriction on the rate and amount of withdrawal" which the District is allowed to enforce as part of its permitting process. GateHouse's motion thus has not established that the inclusion of Special Condition 8 in its operating permits and its enforcement does not fall within Lost Pines's authority.

In order to prevail on its motion for partial summary judgment, GateHouse must do more than conclude the District's actions were impermissible judicial acts to establish that the District acted beyond its authority. It must look to the source of the District's authority and prove that the District did not have the authority to review the CTWSC contract for compliance with Special Condition 8 of the operating permits issued by the District. After looking to the source of the District's authority, the undersigned concludes that GateHouse has not proved that the District acted beyond

19

its authority as a matter of law.[5] The undersigned therefore recommends that the District Court deny GateHouse's motion for partial summary judgment.

## IV.    CONCLUSION

In accordance with the foregoing discussion, the undersigned **RECOMMENDS** that the District Court **DENY** GateHouse's motion for partial summary judgment, Dkt. 58.

The referral of this case to the Magistrate Court should now be canceled.

## V.    WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The district court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen days after the party is served with a copy of the Report shall bar that party from *de novo* review by the district court of the proposed findings and recommendations in the Report and,

---

[5] GateHouse motion appears to argue that Lost Pines had no discretion but to accept the contract and find that it complied with Special Condition 8. *See* Dkt. 58, at 4 (stating that after GateHouse presented the CTWSC agreement to Lost Pines, "rather than accept the fully executed and paid-up contract between GateHouse and CTWSC for 12,000 ac-ft of groundwater, the Defendant Directors voted…."). Where an official has no discretion, such acts are ministerial. *Hall,* 508 S.W.3d at 238 ("'Ministerial acts,'… are those "where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment."). GateHouse has not established as a matter of law that Lost Pines was under an obligation to perform a purely ministerial act upon receipt of the CTWSC agreement or that Lost Pines's duties as to the agreement in this respect were defined in law with precision and certainty.

except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED January 31, 2023.

DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE